158 So. 534

## OXFORD et al. v. ESTES et al.
### 5 Div. 116.

Supreme Court of Alabama.
Oct. 11, 1934.

Rehearing Denied Jan. 24, 1935.

Chas. F. Douglass, of Anniston, for appellees.

Jas. W. Strother, of Dadeville, for appellants.

For other cases see same topic and KEY NUMBER in all Key Number Digests and Indexes

**BOULDIN, Justice.**

James M. Allen died intestate March 1, 1925. He was never married. His heirs are his living sisters, and the descendants of deceased brothers and sisters.

Some of these heirs filed a bill to remove the administration of the estate into the equity court and to sell the real estate for division.

On May 29, 1926, some of the respondents filed a cross-bill, denying that certain parcels of the land were owned by decedent at the time of his death, and setting up title in themselves as heirs and devisees of David G. Allen, a deceased brother of J. M. Allen.

The case, therefore, involves the title to two pieces of real estate, which, for present purposes, are sufficiently designated as a farm of 300 acres, located on the Opelika road near Lafayette, and one residence lot in Lafayette, known as the Homer Hines lot.

Without dispute, the title to the lands was in D. G. Allen at the time of his death, September, 1893.

The course of events presented in pleading and proof during the thirty-two years intervening between the death of D. G. Allen and the death of J. M. Allen (who, at that time and long prior thereto, had been in the actual, open possession of the property, claiming it as his own) is a long, involved story.

We outline such features as appear to us controlling on this appeal.

D. G. Allen, at his death in 1893, left a large estate, much involved in debt. He had been for many years engaged in a mercantile business under the firm name of D. G. Allen & Bro. J. M. Allen was the brother. D. G. Allen left a will, devising the body of his estate, including this property, after payment of debts, to his wife, Fannie Allen, and their three children, then of tender years.

He directed and empowered his executors to continue the mercantile business for a period of five years, with full power to sell personal and real property, etc.

Item 8 of the will read: "I hereby appoint James M. Allen and George E. Burnett, executors of my will, and, having confidence in their honesty, I exempt them from giving bond or security as such and I also hereby appoint said James M. Allen and George E. Burnett, the guardians of my three children, Annie Lemerle Allen, Norma Gunn Allen, and David G. Allen, Jr., and I exempt them as such guardians from giving bond or security as such guardians. I direct that my executors shall not be required to make inventory or appraisement to the Probate Court or to obtain any order for the sale of any property or to make any settlement in said Court."

The wives of Mr. Burnett and D. G. Allen were sisters.

Mr. Burnett was connected with the business as bookkeeper prior to D. G. Allen's death. He is the only one of the actors of those times now living.

The executors proceeded to carry on and gradually wind up the business, and, after some seven or eight years, had succeeded in paying all the indebtedness, aggregating (according to Mr. Burnett, testifying after the lapse of some thirty years) the sum of $85,-000. The books and papers relating to the business, with uncollectible notes and accounts, were then turned over to, or taken over by the widow, Fannie Allen, and have remained under the control of herself or children, as they arrived at maturity, until this suit was filed.

Among the creditors was R. F. Gilder, to whom the firm was largely indebted for borrowed money, apparently at usurious rates of interest.

On January 19, 1897, the farm lands here involved were sold and conveyed by the executors to R. F. Gilder for $2,600. This deed was recorded in 1901. Contemporaneous with such conveyance, Gilder executed to the executors a defeasance or option to repurchase at the same price on or before December 1, 1897.

This option was not exercised before the date named, but on November 28, 1898, Gilder executed a deed to J. M. Allen on a recited consideration of $2,600. This deed was not recorded until after the death of J. M. Allen. It appears that some other deeds to him were left unrecorded. It further appears that at the time Gilder purchased the land, he also rented it to the executors, and they paid rents for years 1897, 1898, and 1899, and by complainants' calculations, it appears this was on a basis of 1 per cent. of $2,600 per

month for 1897, 10 per cent. for the year 1898, and 8 per cent. for the year 1899. Several receipts from Gilder to J. M. Allen dated September to December, 1899, show payments, "to be credited on note," aggregating $1,750.

Gilder is also dead, and all that is known of the transaction consists of available documents with some evidence from witnesses touching matters more than a quarter of a century in the past. Altogether this evidence indicates that Gilder did not want the land, that the executors were pressing him to take it under threat of pleading usury, that Jim Allen finally repurchased the land, giving his note, and getting a deed, and making payment later. It appears that this land was in part assessed for taxes to Gilder down to 1908 and part to J. M. Allen. Thereafter taxes on the entire tract were assessed to and paid by J. M. Allen, down to his death in 1925.

In any event, the documents show the legal title passed out of the estate, and the executors as such, in 1897, and the evidence fully shows that J. M. Allen was in the exclusive actual possession, claiming as his own, and enjoying the income and profits therefrom during the twenty-five years after the possessory rights of Gilder ended.

Respondents to the cross-bill, appellees here, set up title by deed, also prescription, laches, and statute of limitations.

Appellants, in their pleadings, allege a number of grounds for claiming the property in equity. Among them, it is said the transaction between the executors and Gilder was in effect a mortgage, and J. M. Allen, on his purchase, took the position of a mortgagee in possession, liable to account for rents, alleged to be sufficient to pay the mortgage debt.

We note a further allegation that the lapse of twenty years creates a bar by prescription against any lien or right of foreclosure under the mortgage. Very true, the mortgage in this case, if so viewed, dates back to 1898, and all right of the mortgagee to foreclose would be barred by twenty years' prescription.

But the suggestion overlooks the reciprocal rule that a like period of possession by a mortgagee without recognition of any equity of redemption bars the equity of redemption, and vests complete title in the mortgagee. 42 C. J., page 382, § 2146.

Again, it is argued, that if J. M. Allen bought and paid for this land with his own funds, he was, at the time, a trustee of an express trust in possession of same as such, and his title, at the election of the cestuis que trust, must be treated in equity as held in trust for them.

Again, it is argued that the executors sold these lands to pay a firm debt, that the firm was largely indebted to D. G. Allen's estate, that J. M. Allen was indebted to the firm, that it was, therefore, his duty to pay this Gilder debt against his firm, and that equity should treat the entire transaction, sale, and repurchase, as restoring the property to the estate of his brother as at the beginning.

Still further, it is alleged that J. M. Allen did not pay for the land of his own means, but paid Gilder from funds in the hands of the executors; that the transaction was a fraudulent scheme whereby J. M. Allen obtained a deed in his own name, concealed by keeping it off the record; that his possession originated as trustee of an express trust; that there was no change of actual possession; and no knowledge ever brought home to the cestui que trustent of any adverse holding until after his death.

In dealing with these several asserted grounds of relief, and excuses for delay, certain tendencies of the evidence, much obscured by time and death of parties, will be noted.

There is no substantial evidence that the purchase price paid Gilder was funds of the partnership or of the estate of D. G. Allen. At this late date the documents, including the receipts issued to J. M. Allen, should be taken to speak the truth.

As for the state of the partnership accounts as between the partners, this could be ascertained only upon a settlement of the partnership. There is no effort to do this. At this late date, and in view of its long continuance, such accounting would be manifestly impracticable.

To single out specific accounts covering dealings of the executors while continuing the business, wherein an account was kept of funds received by the firm from the estate of D. G. Allen, and his estate charged with supplies furnished his family during the years the business was continued, and the account against J. M. Allen during the same period, could not, as of course, prove the state of accounts between the partners upon a partnership settlement.

As to J. M. Allen's account, it seems to represent all that he got for the many years devoted to the responsibilities and work of an executor and trustee under the will. The record really presents an issue of fact as to whether J. M. Allen ever was a partner inter

sese. Without question, he was a partner as to the public. But testimony of those in best position to know tends to show as between him and his older brother, Jim was merely on a salary, and the business belonged to Dave. No effort is made to show what interest Jim had in the business. Manifestly, after nearly forty years, both partners being dead, it would be futile to inquire into this issue.

On the question of possession taken in the first instance as trustee under the will, with no visible change thereafter, the following tendencies of the evidence are pertinent:

After the business was closed out about 1898 and all books and papers turned over to Fannie Allen, the widow, no personal effects appear to have remained in the hands of the executors.

In 1905, all the lands of the estate not theretofore disposed of (treating the lands in suit as having been disposed of so far as the executors were concerned) were divided up and deeds made to the widow and children, severally. In doing so, the executors took cognizance of certain equities. The two girl children had a policy of life insurance on the life of their father payable to them for $5,000. This was collected by the testamentary guardians, and in the press for money to save the estate from insolvency, this insurance money was used to pay debts. Likewise, D. G. Allen, Jr., the baby boy, had a special bequest of bank stock of the value of $2,500. This was also used, in whole or in part, for like purpose.

In deeding the lands, a reimbursement of these children for the funds so employed was recognized and declared. The widow, it appears, was deeded the home place. She appears to have had individual counsel looking after her interest in that regard.

It thus appears the executors by 1905 had substantially executed their trust, disposed of the property, paid the debts, and made division of remaining lands. No court settlement was made, no discharge shown, no specific account rendered to the widow, the only devisee then sui juris, but the records of their entire stewardship turned over to her. They continued to act as guardians over such estate as the children had until they respectively became of age, or the youngest had his disabilities of nonage removed in 1911.

In considering whether through the future years the widow and children could or did assume the possession of these lands still held by J. M. Allen in his trust capacity, regard must be had to the foregoing tendencies of the evidence, and the terms of item 8 of the will, supra.

■ This trust arose and was executed prior to Code, § 5803, validating provisions of a will exempting executors from making settlement in court, subject to exceptions there stated. But under the rule obtaining prior thereto, an executor following the directions of the will of his testator in that regard was not considered in default, or guilty of a breach of trust, unless and until there was a demand or order for a court settlement. Black v. Morgan, 227 Ala. 327, 149 So. 845; Parker v. Robertson, 205 Ala. 434, 88 So. 418.

■ The testator here may well have desired to avoid the expense of court proceedings involving a long drawn trust in which he was vesting in his brother and friend large discretionary powers. We think it apparent neither these executors nor the devisees contemplated a continuing trust until there was some court action discharging them or settling the trust.

The primary duty was to faithfully execute the will, to pay the debts, and make division of the residue to those entitled, within a reasonable time.

Let us consider the situation during the twenty-one years intervening between the division of the remaining lands in 1905, and the filing of this cross-bill, 1926.

Fannie Allen, the widow of D. G. Allen, lived until 1922.

Lemerle, the oldest daughter, married Mr. Battle. She arrived at full age in 1907, and died in 1918. She is represented by four minor children. Norma married Mr. Oxford. She became of full age in 1911. D. G. Allen, Jr., became of full age in 1914, his disabilities of nonage having been removed in 1911.

The children all received college educations. There is no question of the intelligence of any member of the family.

This farm lay near Lafayette along a public highway. Jim Allen was all the while in the open possession of it, receiving its rents and profits, making improvements thereon.

Neither the widow, so far as known, nor any child ever called on him for possession, or for any accounting for use and occupation. The records showed the title passed to Gilder in 1897, and the tax records showed he and Jim Allen after him had paid the taxes thereon as above noted.

All the substantial data now relied upon as showing fraud or breach of trust was in their

hands, or available to them, save the one fact that J. M. Allen's deed from Gilder was not on record.

As side lights, it may be noted that the widow borrowed money from Jim Allen to help pay expenses at college; that Jim Allen, in 1908, by petition in equity as guardian, obtained an order to borrow money to pay premiums on the security of a life insurance policy in favor of his ward, D. G. Allen, on the life of his mother, for want of other funds.

We have extended this review, probably to undue length, that the application of the governing rules of law may appear.

Prescription, as a bar to actions at law or in equity, is a rule of repose; aims at an end of controversies touching title to property; fixes twenty years as the absolute limit beyond which courts will not inquire; applies to express trusts which have lain dormant, unrecognized, and unasserted for twenty years; no disabilities, such as infancy, prevent or suspend the running of the twenty-year period. The rule is bottomed on the doctrine that demands unasserted for so long a time, either had no foundation in justice, or have been adjusted.

Failure of memory, loss of evidence, death of parties, the probability that the whole truth cannot be ascertained and justice done, enter into the equation as a reason for the rule. It is not a presumption merely, but a rule of law, raising an absolute bar to ancient causes of action. Harrison v. Heflin, 54 Ala. 552; James v. James, 55 Ala. 525; Nettles v. Nettles, 67 Ala. 599; Garrett v. Garrett, 69 Ala. 429; Smith v. Gillam, 80 Ala. 296; Greenlees, Adm'r, v. Greenlees, 62 Ala. 330; Woodstock Iron Co. v. Roberts, 87 Ala. 436, 6 So. 349; Semple v. Glenn, 91 Ala. 245, 6 So. 46, 9 So. 265, 24 Am. St. Rep. 894; Roach v. Cox, 160 Ala. 425, 49 So. 578, 135 Am. St. Rep. 107; Scott v. Scott, 202 Ala. 244, 80 So. 82; Peters Mineral Land Co. v. Hooper, 208 Ala. 324, 94 So. 606; Laird v. Columbia Loan & Investment Co., 216 Ala. 619, 114 So. 208.

Laches is a kindred doctrine in equity, based on lack of diligence and good faith in invoking the court's jurisdiction. Each case turns much on its own facts. Often the period within which suit must be brought is determined by analogy to statutes of limitations, no statute being directly applicable.

In the nature of it, no want of diligence can be imputed to those under disability; or those, who without fault on their part, are without notice or knowledge of the equity they seek to assert.

On the other hand, the rule of diligence applies to the ascertainment of their rights, as well as asserting them by action.

If facts are known which reasonably put one on inquiry, and which, if followed up, would readily discover the situation, the party is held chargeable with notice. He cannot close his eyes, and plead he does not see. Where, as a result of avoidable delay, the original transactions have become so obscure by lapse of time, loss of evidence, or death of parties, as to render it difficult to do justice, so that the court faces a hazard of doing injustice, the court will not grant relief.

Courts of equity specially disfavor suits founded on alleged breach of trust, or fraud, wherein complainant, without a clear showing of good cause for delay, has waited for a long period, and until the death of the party charged, when he can no longer answer such charges. Quickened diligence to unearth matters against his heirs, which were equally open to action while he lived, will not suffice. Much less periods than twenty years, under the facts of the given case, warrant a denial of relief. Rives v. Morris, 108 Ala. 527, 18 So. 743; Salvo v. Coursey, 220 Ala. 300, 124 So. 874; Woods v. Wright, 223 Ala. 173, 134 So. 865; Snodgrass v. Snodgrass, 185 Ala. 155, 64 So. 594.

We conclude this suit was barred by prescription, more than twenty years exclusive possession, after the property had passed out of the trust estate, and there was no recognition of any trust relation thereto on the part of J. M. Allen.

Equally or stronger is the case of laches. The widow of D. G. Allen, and his children, from the time of their arrival at maturity, had every reason to believe, and could have ascertained by the exercise of any diligence whatever, that J. M. Allen was holding and claiming this property as his own, even if it be conceded they did not have full knowledge of such fact.

Indeed, more than ten years elapsed after all these children arrived at full age. During that period, the possession of J. M. Allen had all the elements of an adverse possession. The two living children may well be held barred by the statute of limitations of ten years.

The statute having begun to run against the eldest daughter in her lifetime, it would not be suspended by the intervening infancy of her children. Street v. Shaddix, 197 Ala. 446, 73 So. 73.

The Homer Hines residence lot involved in the litigation is governed by principles above discussed. Appellants confine the argument to the farm lands. Details as to the residence lot need not be discussed.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.